## PHILLIPS ROOFING CO., INC. *v.* MARYLAND BROADCASTING COMPANY

[No. 62, October Term, 1944.]

188

*Decided December 21, 1944.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, MELVIN, BAILEY, and CAPPER, JJ.

*Abram C. Joseph,* with whom were *Louis J. Sagner* and *Herbert H. Rosenbaum* on the brief, for the appellant.

*S. Ralph Warnken,* with whom were *Cook & Markell* on the brief, for the appellee.

BAILEY, J., delivered the opinion of the Court.

The appellant, the Phillips Roofing Co., Inc., filed its bill of complaint in the Circuit Court of Baltimore City praying for an injunction against the appellee, the Maryland Broadcasting Company, restraining it from interfering in any manner with the broadcasts of the appellant over Radio Station WITH, operated by the appellee, during the term of a contract between the parties, and for other relief. After answer and testimony, the Chancellor filed his decree dismissing the bill of complaint with costs. It is from this decree that this appeal is taken.

The contract, which was filed as an exhibit with the bill and offered in evidence, was dated October 12, 1943. It provided that, commencing with October 24, 1943, the appellant was entitled to the facilities of the station for broadcasting its program, "Memory Lane," from 9.15 to 10 o'clock A. M. every Sunday until the end of the Washington Redskins' 1943 football season, at a weekly charge of $1.00, and thereafter from 4.05 to 5 o'clock P. M. every Sunday until December 12, 1944, or one year from the ending of the Washington Redskins' 1943 football season, at a weekly charge of $41.80.

Other pertinent provisions of the contract, appearing among its printed conditions under "1. Payments," are the following:

"(b) Advertiser agrees to pay for such broadcasting at the office of station on or before the twentieth day of

the month following that in which broadcasting is done, prompt payment being of the essence of the contract."

"(e)   Station reserves the right to cancel this contract forthwith at any time in the event of default or violation by advertiser of any of the provisions of this contract or in the event that, in the opinion of station, advertiser's credit shall become impaired.   Upon such cancellation charges in respect of all broadcasting done hereunder and unpaid shall become immediately due and payable. Such cancellation shall not prejudice any other right of station against advertiser."

The facts, material to the issue in this case, are undisputed.   All of the written communications between the parties, except the letter of May 24, 1944, were sent by mail.   The bill for the broadcasts during the month of January was paid by check on March 8, 1944, and the February bill was paid in the same manner on March 27, 1944. Neither of these payments were made within the time specified in the contract.   On April 15, 1944, the president of the broadcasting company wrote a letter to the appellant dealing primarily with other provisions of the contract relative to the delivery of the program material seven days in advance of each broadcast and to the engaging of a competent master of ceremonies. The letter then quoted paragraph 1 (b) of the contract and stated: "On a number of occasions you have failed to comply with this provision of the contract.   We are formally notifying you that we insist upon strict compliance with the above quoted provision of the contract and if you fail to do so we shall exercise our right of cancellation which is provided for in numbered paragraph 1 (e)."   The appellant's attorney replied to this letter on April 17, 1944, discussing the controverted matters but making no comment on the point of prompt payment.   However, the March bill was paid on April 18, 1944, within the time specified in the contract.

The payment for the broadcasts during the month of April was due and payable on May 20, 1944.   Theodore Phillips, president of the appellant, testified that on May

17, 1944, he drew his personal check on the Peoples Bank of Pikesville, Maryland, for $209 to the order of Station WITH in the presence of Gilbert Michel, to whom, at the same time, he delivered his personal check drawn on the same bank to the order of the Adpress for $1,449.26, in payment of a bill for the printing of a pamphlet of poems known as "Ted Phillips' Memory Lane." He gave the check to Miss Murray, his secretary, who had been working for him for more than eight years. The Adpress bill and check and the check stubs were offered in evidence. These stubs disclosed the Adpress check drawn on May 17, followed by a check to John Hancock Life Insurance Company on May 16, and then on May 17, a check to WITH for advertising in the amount of $209. He testified further that there was nothing unusual in paying his company's bills from his personal account.

Michel's testimony was to the effect that, when he was in appellant's office collecting the Adpress bill, he saw Phillips draw another check and hand it to his secretary. He was not allowed to testify as to Phillips' comments about the check.

Miss Murray's testimony was as follows: "I was at the office on Wednesday, May 17, 1944, and recall Mr. Gilbert Michel being in Mr. Phillips' private office. He was there close to an hour. Mr. Phillips and Mr. Michel were sitting in the office and Mr. Phillips called me into his office and told me to look up two statements, one for the Adpress Printing Company and one for Station WITH. I got the statements for Mr. Phillips and he made out two checks. He handed one to Mr. Michel and gave me the other check, and told me to mail it to WITH, which I did. I mailed it after I got off, between five and five-fifteen at the corner of Baltimore and Greene Streets where I mail every night. It was addressed to Station WITH, East Lexington Street, Baltimore 2, Maryland, and was in an envelope, with a three-cent stamp on it, and the return address of Phillips Roofing Company in the upper left-hand corner. At the same time, I mailed other pieces, including a couple of copies of contracts and

one to an insurance company. When Mr. Phillips gave me the check to be mailed I picked out from our records the statement from Maryland Broadcasting Company, WITH, for April. I stapled the statement together with the check as I do every other one. I definitely used in this particular case the same procedure previously adopted in mailing the check together with the statements."

It is admitted that appropriate witnesses in the employ of the appellee would have testified, if called, that the check was never received by it. Thereafter on May 24, 1944, the president of the appellee wrote a letter to the appellant, quoting paragraphs 1 (b) and 1 (e) of the contract and stating: "The contract charge for broadcasting during the month of April was payable at our office on or before May 20, 1944. Such charges have not been paid. This is a default or violation by you of the above quoted provision 1 (b) of said contract. Pursuant to paragraph 1 (e), above quoted, we hereby cancel said contract between us dated October 12, 1943." This letter was delivered to the office of the appellant at 9 South Greene Street, in Baltimore, by messenger. The appellant, in its bill of complaint, alleged that it was ready, willing and able to pay any and all sums due the appellee under the contract, and, at the hearing, made a tender of the amount due for the April broadcasts.

In equity, time is not generally deemed as being of the essence of the contract. *Miller's Equity Procedure*, Sec. 662; *Smoot v. Rea*, 19 Md. 398; *Maughlin v. Perry*, 35 Md. 352. But this general rule has certain well defined exceptions. One of the exceptions is that where the parties have expressly treated time as of the essence of the agreement, by incorporating such a clause in the contract, courts of equity will not lend their aid to enforce specifically the agreement, regardless of the limitation of time. *Miller's Equity Procedure, Sec.* 663; *Coleman v. Applegarth*, 68 Md. 21, 11 A. 284; *Acme Building Association v. Mitchell*, 129 Md. 406, 99 A. 545; *Jaeger v. Shea*, 130 Md. 1, 99 A. 954; *Abrams v. Eckenrode*, 136 Md. 244, 110 A. 468; *Stern v. Shapiro*, 138 Md.

615, 114 A. 587; *Tarses v. Miller Fruit & Produce Co.,* 155 Md. 448, 142 A. 522; *American Medicinal Spirits Co. v. Mayor & City Council of Baltimore,* 165 Md. 128, 166 A. 407.

In the case of *Scarlett v. Stein,* 40 Md. 512, at page 525, this Court, speaking through Judge Robinson, said: "Whether time is to be considered *as of the essence of the contract* must, of course, depend upon the intention of the parties. When this intention is expressed in clear and unambiguous terms, the contract must speak for itself, and the liability of the parties must be determined by the plain and obvious meaning of the language used." This language was quoted with approval in *Diamond v. Shriver,* 114 Md. 643, 80 A. 217.

It is needless for us to cite other authorities to show that time was of the essence of the contract in the present case. The next question for our consideration is whether the condition for prompt payment had been waived by the appellee by its acceptance of payments after their due date. In *Williston on Contracts,* Revised Edition, Vol. 3, Sec. 741, it is stated that "continued acceptance of late performance without objection may operate as a permission to make similarly late performance in the future, even where the exact time of performance is made of the essence by the contract between the parties."

In *Stevinson v. Joy,* 164 Cal. 279, 285, 128 P. 751, 753, the court said: "Where time is made of the essence of the contract for the payment of rent or other payments of money, and this covenant has been waived by the acceptance of the rent or other moneys after they are due, and with knowledge of the facts, such conduct will be regarded as creating 'such a temporary suspension of the right of forfeiture as could only be restored by giving a definite and specific notice of an intention to enforce it'." This principle is approved and applied in *Monson v. Bragdon,* 159 Ill. 61, 42 N. E. 383; *Boone v. Templeman,* 158 Cal. 290, 110 P. 947; and *Standard Brewing Co. v. Anderson,* 121 La. 935, 46 So. 926.

Even though, in the instant case, the acceptance of the payments for the January and February broadcasts at a time when the said payments were overdue may be considered as a waiver of the condition as to prompt payment, it was not an irrevocable waiver of the contractual provision. We are of the opinion that, under the facts in this case and in accordance with the authorities above cited, the letter of April 15, 1944, sent by the broadcasting company to the appellant insisting upon prompt payment in accordance with the terms of the contract was sufficient notice to reinstate the provision and to justify a cancellation of the contract for a violation thereof. In the case of *Lombardo v. Clifford Bros. Co.*, 139 Md. 32, 114 A. 849, this Court held that the conduct of a landlord, in a long course of dealing, in accepting rent a number of days after it was due, was sufficient to lead the tenant to believe that prompt payment would not be insisted upon and that the landlord was precluded from claiming a forfeiture for a breach of the condition of prompt payment, without notice of her intention to do so. The Court cites 16 *R. C. L., Landlord and Tenant,* par. 652. The same principle is laid down in 32 *Am. Jur., Landlord and Tenant,* par. 882. And in *Williston on Contracts,* supra, Sec. 741, it is stated that "where performance on the exact date fixed by an executory contract has once been excused, neither party can rescind on account of delay without first giving notice requiring performance within a reasonable time specified." The same rule as to notice is recognized in *Restatement of the Law, Contracts,* Sections 88 (2) and 311.

We must next consider whether under the facts in this case there was such a breach of the condition for prompt payment as to warrant the broadcasting company in declaring the forfeiture or cancellation of the contract. The evidence is clear, convincing and uncontradicted that the check in payment of the April broadcasting bill was actually deposited in a regular depository maintained by the Postoffice Department on May 17, 1944, in ample time to reach the office of the appellee before May 20,

1944, the date on which the payment was due, and that the United States mail was customarily used by both parties to the contract in transacting business under the contract, in sending statements, in making payments and in conducting negotiations relative to the conditions of the contract and the performance thereof. The general rule with respect to forfeiture of leases is stated in 32 *Am. Jur., Landlord and Tenant,* Sec. 854, as follows: "Irrespective of whether the mailing of the rent on the day it is due technically constitutes a payment within the time allowed by the lease, such mailing precludes forfeiture, or constitutes a sufficient basis for equitable relief against forfeiture, on the ground that there has been a failure, neglect, or refusal to pay the rent when due. Also, the mailing of the amount of rentals in time to have reached the lessor in the ordinary course of mail to comply with the terms of the lease, will prevent a cancellation of the lease for failure to pay the rentals at the stipulated time, the remittance having been delayed in the mail." We think this rule is equally applicable to contracts of the character involved in this case. In *Paducah Home Oil Co. v. Paxton,* 222 Ky. 778, 2 S. W. 2d 650, 56 A. L. R. 797, it was held that equity would relieve from forfeiture of a lease for non-payment of rent in time, where a check for the rent was mailed in time and miscarried in the mail, and the tenant, as soon as notified of the default, made a tender in cash of the amount due. In its opinion the Court quoted from *Farmer v. Pitts,* 108 Neb. 9, 187 N. W. 95, 96, 24 A. L. R. 719, as follows: "The ordinary principles of reason, common sense and justice should govern in questions of this kind. The lessee, in law, had a right to assume that the post office department would do its duty and deliver the envelope containing the rent in due time, and that the lessor would, in justice, accept such rent; and if for any reason it was not received or delivered the lessee should, as a matter of ordinary fairness and justice, be advised of such fact and have a chance to remedy the same." To the same effect is the case of *Thompson v. Coe,* 96 Conn.

644, 115 A. 219, 223, 17 A. L. R. 1233, where it was held that equity will grant relief from forfeiture of a lease for non-payment of rent within the time limited, where it was due to the loss in the mail of the letter in which the rent was transmitted, which was mailed before the expiration of the time limited, where the tenant offered to make good the loss as soon as it was discovered and never intended to forfeit the lease. The facts, as stated in the opinion, bear a striking similarity to the facts in the instant case: It had been customary, without objection, to send rent by check or money order through the mail; the plaintiff sent the cash by the mail on March 13 in ample time, by ordinary course of the mail, to reach the defendant within the time limited in the lease. The Court stated in its opinion: "The plaintiff made the United States Mail his messenger. * * * he placed three bills amounting to $30—the rent due on the 15th—in an envelope, marked with a return card in the corner, and directed to the defendant in the usual way, believing in good faith that this letter would be delivered. The money was lost or stolen while in transit. This, so far as the plaintiff was concerned, was an accident. He naturally presumed the delivery of the money in ordinary course of the mail."

The same rule was applied with respect to the payment of premiums on life insurance policies in the case of *Brown v. Pilot Life Insurance Co.*, 185 S. C. 334, 338, 194 S. E. 121, 122, where the Court said: "It has also been held, and we think correctly so, that under policies requiring payment at a certain place by a certain time under penalty of forfeiture, a deposit thereof in the mail, properly addressed, and in time according to the usual course of mail, to reach the prescribed place by the time it is due, will prevent a forfeiture if the insurer has requested, authorized, or acquiesced in the sending of premiums by mail. And payment in this wise has been held to be good, even though the check for the premium due does not in fact reach its destination at all, or until

after the due date, and notwithstanding time be regarded as the essence of the contract."

The arbitrary conduct of the appellee, in summarily cancelling the contract four days after the payment was due, without any inquiry of the appellant as to the reason for the delay in payment, indicates to us that it was more interested in cancelling the contract than it was in collecting the sum due. Its conduct does not commend itself to a court of equity. It is our conclusion that the mailing of the letter of May 17, 1944, enclosing the check for the April bill, according to the usual course of the mail and according to the usual custom between the parties, was such a compliance with the provision of the contract relating to prompt payment that the cancellation of the contract by the appellee was unwarranted and that a court of equity will intervene to relieve from the forfeiture. For the reasons stated it follows that the decree of the learned Chancellor dismissing the bill of complaint must be reversed.

The contract, by its terms, terminated on December 12, 1944, or one year from the ending of the Washington Redskins' 1943 football season. As there is no evidence in the record showing the date of the ending of said football season, we must conclude that it terminated on December 12. As the contract has expired it is now too late to grant an injunction to restrain the appellee from interfering with the rights of the appellant under the contract. But the appellant may have suffered damages by reason of the illegal cancellation of the contract by the appellee. The bill of complaint contains a prayer for general relief. Under the prayer for general relief the Court is not confined to what may be specially asked, but may adapt the relief to the nature of the case as stated in the bill; and if the specific relief prayed for cannot be granted, the plaintiff may be given any relief which is consistent with and warranted by the allegations of the bill. *Miller's Equity Procedure*, Sec. 100; *Hill v. Pinder*, 150 Md. 397, 133 A. 134; *Boehm v. Boehm*, 182 Md. 254, 34 A. 2d 447. Even though the granting of

the injunction would be a nugatory act, the Chancellor should retain his jurisdiction until he makes a final decree determining all the rights and equities of the parties within the scope of the pleadings for the purpose of granting complete relief. *Poe v. Munich Re-Insurance Co.*, 126 Md. 520, 95 A. 164; *Smith v. Shiebeck*, 180 Md. 412, 24 A. 2d 795; *Borssuck v. Pantaleo*, 183 Md. 148, 36 A. 2d 527. We shall remand the proceedings so that the appellant may have an opportunity to prove the damages, if any, which he may have suffered by reason of the cancellation of the contract. *Western Maryland Dairy v. Chenowith*, 180 Md. 236, 23 A. 2d 660.

> *Decree reversed and cause remanded for further proceedings, with costs to the appellant.*